# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

MARK A. B.,                          )
                                     )
            Plaintiff,               )
                                     )
      v.                             )          1:22CV834
                                     )
KILOLO KIJAKAZI,                     )
Acting Commissioner of Social        )
Security,                            )
                                     )
            Defendant.               )

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Mark A. B., brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Acting Commissioner of Social Security (the "Commissioner"), denying Plaintiff's claim for Disability Insurance Benefits ("DIB").  (Docket Entry 1.)  The Commissioner has filed the certified administrative record (Docket Entry 7 (cited herein as "Tr. __")), and the parties have submitted dispositive briefs in accordance with Rule 5 of the Supplemental Rules for Social Security Actions under 42 U.S.C. § 405(g) (Docket Entries 15, 16).  For the reasons that follow, the Court should enter judgment for the Commissioner.

## I.  PROCEDURAL HISTORY

Plaintiff applied for DIB (Tr. 221-26), alleging a disability onset date of April 11, 2018 (see Tr. 223).  Upon denial of that

application initially (Tr. 71-83, 112-15) and on reconsideration (Tr. 84-111, 119-26),[1] Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 127-28). Plaintiff, his non-attorney representative, and a vocational expert ("VE") attended the hearing. (Tr. 40-70.) The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act. (Tr. 23-39.) The Appeals Council thereafter denied Plaintiff's request for review (Tr. 1-6, 218-20, 336-40), thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that decision, the ALJ made the following findings later adopted by the Commissioner:

> 1.   [Plaintiff] meets the insured status requirements of the . . . Act through December 31, 2023.
>
> 2.   [Plaintiff] has not engaged in substantial gainful activity since April 11, 2018, the alleged onset date.
>
> 3.   [Plaintiff] has the following severe impairments: osteoarthritis; right finger contracture; diabetes mellitus; and hypertension.
>
> . . .
>
> 4.   [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

---

[1] Following denial of Plaintiff's claim at the reconsideration level of review, the SSA's Office of Quality Review ("OQR") conducted a further review of Plaintiff's claim and affirmed the reconsideration determination (see Tr. 98-111). See Program Operations Manual System ("POMS") DI 30005.001 ("OQR reviews sampled cases to ensure that the evidence supports the determination and the determination conforms to the [SSA]'s [] policies and procedures. When reviewing determinations, quality reviewers use the same policy and procedural guidelines adjudicating components use.").

. . .

5.  . . . [Plaintiff] has the residual functional
capacity to perform medium work . . . in that he can
lift, carry, push, and pull 50 pounds occasionally and 25
pounds frequently. [Plaintiff] can frequently push/pull
with his right upper extremity (non-dominant) and left
lower extremity. [Plaintiff] can occasionally climb
ladders, ropes or scaffolds and frequently climb ramps
and stairs. [Plaintiff] can frequently balance, as that
term is defined in the [<u>Dictionary of Occupational Titles</u>
("<u>DOT</u>")] and frequently stoop, kneel, crouch, and crawl.
[Plaintiff] can frequently finger with his right upper
extremity (non-dominant). [Plaintiff] can have
occasional exposure to hazardous machinery and no
exposure to unprotected heights.

. . .

6.  [Plaintiff] is unable to perform any past relevant
work.

. . .

10.  Considering [Plaintiff]'s age, education, work
experience, and residual functional capacity, there are
jobs that exist in significant numbers in the national
economy that [Plaintiff] can perform.

. . .

11.  [Plaintiff] has not been under a disability, as
defined in the . . . Act, from April 11, 2018, through
the date of this decision.

(Tr. 28-35 (bold font and internal parenthetical citations

omitted).)

## II.  DISCUSSION

Federal law "authorizes judicial review of the Social Security

Commissioner's denial of social security benefits." <u>Hines v.

Barnhart</u>, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope

3

of . . . review of [such a] decision . . . is extremely limited."
Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). Plaintiff has
not established entitlement to relief under the extremely limited
review standard.

## A. Standard of Review

"[C]ourts are not to try [a Social Security] case de novo."
Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a
reviewing court must uphold the factual findings of the ALJ
[underlying the denial of benefits] if they are supported by
substantial evidence and were reached through application of the
correct legal standard." Hines, 453 F.3d at 561 (internal brackets
and quotation marks omitted).

"Substantial evidence means 'such relevant evidence as a
reasonable mind might accept as adequate to support a conclusion.'"
Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting
Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of
more than a mere scintilla of evidence but may be somewhat less
than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th
Cir. 2001) (internal brackets and quotation marks omitted). "If
there is evidence to justify a refusal to direct a verdict were the
case before a jury, then there is substantial evidence." Hunter,
993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not
undertake to re-weigh conflicting evidence, make credibility

4

determinations, or substitute its judgment for that of the [ALJ, as adopted by the Commissioner]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the ALJ)." Id. at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" id. (quoting 42 U.S.C. § 423(d)(1)(A)).[2]  "To regularize the

---

[2] The Act "comprises two disability benefits programs. [DIB] . . . provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

5

adjudicative process, the Social Security Administration [('SSA')] has . . . promulgated . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." Id. "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id. (internal citations omitted).

This sequential evaluation process ("SEP") has up to five steps:  "The claimant (1) must not be engaged in 'substantial gainful activity,' i.e., currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity [('RFC')] to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of Soc. Sec. Admin., 174 F.3d 473, 475 n.2 (4th Cir. 1999).[3]  A finding adverse to the claimant at any of several points in the SEP forecloses an award and ends the inquiry.  For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied.  The second step determines if the claimant is 'severely' disabled.  If not,

_____

[3] "Through the fourth step, the burden of production and proof is on the claimant.  If the claimant reaches step five, the burden shifts to the [government] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

benefits are denied." <u>Bennett v. Sullivan</u>, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled." <u>Mastro</u>, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's [RFC]." <u>Id.</u> at 179.[4] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. <u>Id.</u> at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." <u>Hall</u>, 658 F.2d at 264-65. If, at this step, the government cannot carry its "evidentiary burden of proving that [the claimant]

---

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." <u>Hines</u>, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." <u>Hall</u>, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (<u>e.g.</u>, pain)." <u>Hines</u>, 453 F.3d at 562-63.

7

remains able to work other jobs available in the community," the claimant qualifies as disabled.  <u>Hines</u>, 453 F.3d at 567.[5]

## B.  Assignments of Error

Plaintiff argues that the Court should overturn the ALJ's finding of no disability on these grounds:

1) "[t]he limitations described by the [ALJ] did not adequately consider the effects of [ P]laintiff's diabetes, including the need to immediately check sugar when feeling possible low sugar symptoms[ and, t]o a lesser but non-negligible extent, he has symptomatic hypoglycemic episodes which are without symptoms and therefore unpredictable" (Docket Entry 15 at 3 (block formatting and underscoring omitted));

2) "[t]he ALJ erred in substituting her opinion for that of physicians with respect to [P]laintiff's ability to stand and walk; [P]laintiff's knee osteoarthritis would prevent him from performing on his feet all day, especially at the medium level jobs identified by the VE" (<u>id.</u> at 6 (block formatting and underscoring omitted)); and

---

[5] A claimant thus can qualify as disabled via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five.  Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis.  <u>See, e.g.,</u> <u>Hunter</u>, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

8

3) "Plaintiff would have been unable to do the full range of medium work required in jobs on which the ALJ relied due to documented limitations" (id. at 9 (block formatting and underscoring omitted)).

Defendant contends otherwise and seeks affirmance of the ALJ's decision. (Docket Entry 16 at 7-20.)

## 1. **Effects of Diabetes**

In Plaintiff's first issue on review, he maintains that "[t]he limitations described by the [ALJ] did not adequately consider the effects of [ P]laintiff's diabetes, including the need to immediately check sugar when feeling possible low sugar symptoms[ and, t]o a lesser but non-negligible extent, he has symptomatic hypoglycemic episodes which are without symptoms and therefore unpredictable." (Docket Entry 15 at 3 (block formatting and underscoring omitted).) More specifically, Plaintiff argues that "[t]he point here is not the amount of time needed to check sugar - though that time would be increased if [sic] to mention the time it would take to eat and wait for improvement if sugar were low - but that the hypoglycemic insensitivity would mean that when [P]laintiff thought he recognized these symptoms, he would have to stop what he was doing right away, even if it meant interrupting a task." (Id. at 4.) Plaintiff additionally faults the ALJ for "discredit[ing]" the opinion of consultative medical examiner Dr. Stephen Burgess "that [P]laintiff would have mild to moderate

limitation in several activities including hearing and speaking"
(id. (referencing Tr. 414)), because Plaintiff lacked an
"impairment which would limit hearing or speaking" (id.
(referencing Tr. 32)), contending that Plaintiff's "reported
episodes of syncope" would render him "unable to hear or speak"
(id.).  According to Plaintiff, even "having breaks and being
allowed 10% off task time . . . would not enable him to be a
productive worker."  (Id.)  Those contentions miss the mark.

     RFC measures the most a claimant can do despite any physical
and mental limitations.  Hines, 453 F.3d at 562; 20 C.F.R.
§ 404.1545(a).  An ALJ must determine a claimant's exertional and
non-exertional capacity only after considering all of a claimant's
impairments, as well as any related symptoms, including pain.  See
Hines, 453 F.3d at 562-63; 20 C.F.R. § 404.1545(b).  The ALJ then
must match the claimant's exertional abilities to an appropriate
level of work (i.e., sedentary, light, medium, heavy, or very
heavy).  See 20 C.F.R. § 404.1567.  Any non-exertional limitations
may further restrict a claimant's ability to perform jobs within an
exertional level.  See 20 C.F.R. § 404.1569a(c).

     "The RFC assessment must include a narrative discussion
describing how the evidence supports each conclusion, citing
specific medical facts (e.g., laboratory findings) and nonmedical
evidence (e.g., daily activities, observations). . . .  The [ALJ]
must also explain how any material inconsistencies or ambiguities

10

in the evidence in the case record were considered and resolved." Social Security Ruling 96-8p, Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims, 1996 WL 374184, at *7 (July 2, 1996) ("SSR 96-8p"). Although the ALJ need not discuss every piece of evidence in making an RFC determination, see Reid v. Commissioner of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014), he or she "must both identify evidence that supports his [or her] conclusion and build an accurate and logical bridge from that evidence to [that] conclusion," Woods v. Berryhill, 888 F.3d 686, 694 (4th Cir. 2018) (internal emphasis, quotation marks, and brackets omitted). Here, the ALJ's decision supplies the necessary "accurate and logical bridge," id. at 694 (internal quotation marks omitted), between the evidence and her findings that Plaintiff's diabetes mellitus (A) qualified as "severe" (Tr. 28) but (B) "would [not] support a need to check blood sugar so frequently as to render him off task outside of employer tolerances or to require additional breaks" (Tr. 33).

To begin, the ALJ's evaluation of the opinion evidence explains the absence of a work-preclusive off-task time allowance and/or additional breaks in the RFC. In that regard, the ALJ credited the state agency medical consultants' opinions that Plaintiff remained capable of performing a range of medium work with additional postural, manipulative, and environmental

11

limitations, but without any allowances for off-task time or additional breaks (see Tr. 77-79, 90-92, 105-07). (See Tr. 32-33.)[6] The ALJ further deemed "not persuasive" Dr. Burgess's consultative opinion "that [Plaintiff]'s ability to perform work-related activities such as bending, stooping, lifting, walking, crawling, squatting, carrying, traveling, pushing, and pulling heavy objects, as well as the ability to hear or speak, appeared to be mildly and intermittently more moderately impaired" (Tr. 32), and provided the following rationale for that finding:

> The [ALJ] does not find the opinions of Dr. Burgess persuasive, as they are vaguely expressed. Moreover, there is no support for any limitation in hearing or speaking and this is inconsistent with the medical evidence of record. Even Dr. Burgess noted that [Plaintiff]'s hearing appeared to be adequate for conversation. There is no evidence of any speaking problem. Dr. Burgess's suggestion that [Plaintiff] had even a mild limitation in this area undermines [Dr. Burgess's] entire opinion.

(Id. (emphasis added) (internal parenthetical citations omitted).) Plaintiff challenges the ALJ's reliance on Dr. Burgess's hearing and speaking limitations as a rationale for discounting Dr. Burgess's opinion, and maintains that Plaintiff's "reported episodes of syncope" would render him "unable to hear or speak." (Docket Entry 15 at 4.) That argument fails for two reasons.

---

[6] The ALJ found the consultants' opinions only "partially persuasive" (Tr. 32), because the ALJ "f[ound] that the limiting [sic] [Plaintiff] to standing, walking, or sitting only 6 hours in an 8-hour workday [wa]s not supported in the record" (Tr. 33; see also Tr. 77, 91, 105). For the reasons discussed in connection with Plaintiff's second assignment of error, the ALJ did not prejudicially err in that regard.

12

First, the ALJ discounted Dr. Burgess's opinions on two grounds: 1) his opinion that Plaintiff's work-related abilities "appear[ed] to be mildly and intermittently more moderately impaired" (Tr. 414) qualified as "vague[]" (Tr. 31); and 2) "no support [existed] for any limitation in hearing or speaking and this [wa]s inconsistent with the medical evidence of record" (id.). Plaintiff did not contest the ALJ's vagueness ground (see Docket Entry 15), and "[v]agueness is a proper ground for limiting the weight given medical source opinions," Robertson v. Saul, No. 5:18CV454, 2019 WL 7585180, at *11 (E.D.N.C. Dec. 19, 2019) (unpublished), recommendation adopted, 2020 WL 241552 (E.D.N.C. Jan. 14, 2020) (unpublished); see also Gallardo v. Berryhill, No. 1:16CV355, 2017 WL 1409575, at *7 (M.D.N.C. Apr. 20, 2017) (unpublished) (deeming vagueness "permissible grounds on which to discount a medical source's opinions"), recommendation adopted, 2017 WL 2623884 (June 16, 2017) (unpublished) (Schroeder, J.).

Second, the ALJ correctly noted that the record did not support Dr. Burgess's "mild[] and intermittently more moderate[]" (Tr. 414) limitations on Plaintiff's abilities to hear and speak. (See Tr. 32.) As the ALJ observed (see id.), Dr. Burgess found Plaintiff's hearing "adequate for normal conversation" and did not note any speaking impairments (see Tr. 412 (noting no impairment of Plaintiff's head and throat on examination)). Although Plaintiff attempts to link Dr. Burgess's hearing and speaking limitations to

13

Plaintiff's inability to hear and speak during hypoglycemic syncopal episodes (see Docket Entry 15 at 4), Dr. Burgess did not make any such linkage in his opinion (see Tr. 414). Moreover, Plaintiff's argument amounts to rank speculation, as Dr. Burgess consistently phrases his opinions regarding a claimant's work-related abilities to include limitations on hearing and speaking regardless of whether the claimant has alleged any impairments that would impact his or her ability to hear or speak, see Meeks v. Kijakazi, No. 1:20CV261, 2022 WL 4456253, at *5 (W.D.N.C. Sept. 23, 2022) (unpublished) ("Dr. Burgess opined, '[t]he claimant's ability to perform work-related activities such as bending, stooping, lifting, walking crawling, squatting, carrying, traveling, pushing and pulling heavy objects, as well as the ability to hear or speak, appears to be mildly and intermittently more moderate[ly] impaired.'" (emphasis added)); Neblett v. Kijakazi, No. 1:21CV267, 2022 WL 1211792, at *6 (M.D.N.C. Apr. 25, 2022) (unpublished) ("Dr. Burgess's report does not explain why he rated [the p]laintiff's abilities to hear and speak as 'mildly and intermittently more moderately impaired,' especially given the lack of findings regarding [the p]laintiff's speech and Dr. Burgess's earlier finding that [the p]laintiff's 'hearing appear[ed] to be adequate for normal conversation.'" (emphasis added) (internal parenthetical citations omitted)), recommendation adopted, 2022 WL 17832124 (M.D.N.C. Sept. 21, 2022) (unpublished) (Osteen, Jr., J.); Watkins

14

v. Commissioner of Soc. Sec. Admin., No. 1:20CV380, 2022 WL 1101760, at *3 (W.D.N.C. Jan. 21, 2022) (unpublished) ("Dr. Burgess concluded that [the p]laintiff's 'ability to perform work-related activities such as bending, stooping, lifting, walking, crawling, squatting, carrying, traveling, pushing and pulling heavy objects, as well as the ability to <u>hear or speak</u>, appear[ed] to be mildly to moderately impaired. . . .'" (emphasis added)), <u>recommendation adopted</u>, 2022 WL 822166 (W.D.N.C. Mar. 18, 2022) (unpublished); <u>Norman v. Berryhill</u>, No. 1:16CV997, 2017 WL 3396517, at *8 (M.D.N.C. Aug. 8, 2017) (unpublished) ("Dr. Burgess opined as follows: '[The plaintiff's] ability to perform work-related activities such as bending, stooping, lifting, walking, crawling, squatting, carrying, traveling, pushing and pulling heavy objects, as well as the ability to <u>hear or speak</u>, appears to be mildly impaired due to the sum of the physical findings described above.'" (emphasis added)), <u>recommendation adopted</u>, slip op. (M.D.N.C. Sept. 13, 2017) (Osteen, Jr., C.J.); <u>McLawhorn v. Colvin</u>, No. 2:13CV24, 2014 WL 2215936, at *3 (W.D.N.C. May 29, 2014) (unpublished) ("Dr. Burgess's opinion details [the p]laintiff's 'ability to perform work-related activities such as bending, stooping, lifting, walking, crawling, squatting, carrying, traveling, pushing and pulling heavy objects as well as the ability to <u>hear or speak</u> appears to be moderately impaired . . . .'" (emphasis added)); <u>Courtney v. Colvin</u>, No. 2:12CV73, 2014 WL 1882583, at *4 (W.D.N.C.

15

May 12, 2014) (unpublished) (noting "Dr. Burgess's findings . . . that the [p]laintiff's 'ability to perform work-related activities such as bending, stooping, lifting, walking, crawling, squatting, carrying, traveling, pushing and pulling heavy objects, as well as the ability to <u>hear or speak</u>, appeared to be only mildly impaired'" (emphasis added)); <u>Teems v. Colvin</u>, No. 2:12CV82, 2013 WL 5536787, at *8 (W.D.N.C. Oct. 4, 2013) (unpublished) ("Dr. Burgess opined that [the p]laintiff's <u>hearing</u> 'appear[ed] to be mildly impaired to moderately impaired.' However, [the ALJ] also noted that '[the plaintiff's] hearing was adequate for normal conversation' and made 'no objective findings' that contradict that notation. Treatment notes throughout the record consistently indicate that [the p]laintiff did not suffer 'diminished hearing' or any other 'hearing problems' at any time between the alleged onset date and the date of the ALJ's decision." (emphasis added) (internal parenthetical citations omitted)).

The ALJ's analysis of Plaintiff's subjective symptom reporting further explains the absence of time off-task or additional breaks in the RFC. The ALJ noted Plaintiff's testimony "that mostly his diabetes had him worried and he did not think he would be able to work anymore" (Tr. 30; <u>see also</u> Tr. 54-55), that "[h]is diabetes [wa]s probably a little better since he stopped working" (Tr. 30; <u>see also</u> Tr. 57), "that he could control his diabetes better now and check[ed] his sugars a lot" (Tr. 30; <u>see also</u> Tr. 57, 59); and

16

"that his sugar could get pretty low" (Tr. 30; see also Tr. 60-61). The ALJ, however, found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms [we]re not entirely consistent with the medical evidence and other evidence in the record" (Tr. 31). In support of that finding, the ALJ observed that Plaintiff's "treatment history during the relevant period ha[d] been conservative with no evidence of surgical intervention or end-stage organ damage" (Tr. 33), as well as that he "reported being able to complete simple meals, do laundry, mow grass, drive, and shop" (id.). Plaintiff raises challenges to both of those observations by the ALJ (see Docket Entry 15 at 8, 9) and, for the reasons discussed in connection with Plaintiff's second assignment of error, neither of those challenges carries the day.

The ALJ's evaluation of the objective medical evidence in this case additionally bolsters the lack of off-task time and/or additional breaks in the RFC. In that regard, the ALJ noted that, throughout Plaintiff's follow-up visits for his diabetes, his hemoglobin A1C remained stable and under 7.0% (see Tr. 31-32), that the treatment "[n]otes indicated that [he] was very comfortable managing his insulin" (Tr. 31), that he "had no diabetic retinopathy" on examination (Tr. 32), and that "[h]e had a normal [diabetic] foot exam and a normal neurologic exam" (id.). That evidence, showing good control of blood sugars and the absence of

17

significant diabetic complications, supports the omission of off-task time and/or additional breaks from the RFC.

Plaintiff concedes that "the records of Eden Internal Medicine (Dr. [Dhruv B.] Vyas), [P]laintiff's treating physician[,] do not reflect problems with 'sugar lows.'" (Docket Entry 15 at 4.) Plaintiff speculates that, "perhaps Dr. Vyas, a small-town [general practitioner], did not understand th[at] aspect of [Plaintiff]'s diabetic problem, or perhaps the doctor-patient communication was very bad." (Id.) Plaintiff's counsel deems the latter possibility "plausible," noting that "[P]laintiff is the ultimate stoic patient and client, not complaining about anything that is not immediately affecting him unless asked about it directly," as well as that "Dr. Vyas has been described to [counsel] by a Rockingham County acquaintance as 'a man of few words.'" (Id. at 5.)

Counsel's speculative musings and hearsay reports do not constitute facts present in the record before the ALJ. The ALJ, on the record before her, had <u>no</u> basis to discount Dr. Vyas's repeated notations that Plaintiff <u>denied</u> episodes of hypoglycemia. (<u>See</u> Tr. 355, 368, 372, 375, 377, 381, 384, 427, 430, 446, 455, 459.) Indeed, Dr. Vyas documented two occasions on which Plaintiff reported low blood sugar (<u>see</u> Tr. 358-59 (reflecting Plaintiff's report of syncopal episode "probably" due to hypoglycemia, but also noting "excellent" control of blood sugar and describing Plaintiff as "well aware of symptoms" of hypoglycemia), 421 (documenting

18

Plaintiff's report to Dr. Vyas of "some lows" while also describing Plaintiff as "very comfortable managing his insulin," and reflecting Plaintiff's assurance that he would "let [Dr. Vyas] know if [Plaintiff] ha[d] any problems"), which debunks Plaintiff's speculation that Dr. Vyas "did not understand" hypoglycemia, or that he did not communicate effectively with Plaintiff about managing his diabetic symptoms (Docket Entry 15 at 4).

In sum, because the ALJ built "an accurate and logical bridge," Woods, 888 F.3d at 694 (internal quotation marks omitted), between the evidence and her RFC findings, Plaintiff's first issue on review fails as a matter of law.

### 2. Opinions of the State Agency Medical Consultants

Plaintiff next asserts that "[t]he ALJ erred in substituting her opinion for that of physicians with respect to [P]laintiff's ability to stand and walk; [P]laintiff's knee osteoarthritis would prevent him from performing on his feet all day, especially at the medium level jobs identified by the VE." (Docket Entry 15 at 6 (block formatting and underscoring omitted).) In particular, Plaintiff takes issue with the ALJ's disagreement with the state agency medical consultants' opinions that Plaintiff could stand and walk up to six hours in an eight-hour workday, finding instead that Plaintiff could stand and walk up to eight hours in a workday. (Id. at 6-7 (citing Tr. 32-33, and referencing Tr. 77, 91, 105).) According to Plaintiff, because Dr. Burgess rated Plaintiff's

19

"'work-related activities'" as "'mildly and intermittently more moderately impaired'" (id. at 9 (quoting Tr. 414)), "we can add Dr. Burgess's opinion to those of the [state agency] physicians who do not believe [Plaintiff] can stand on his feet eight hours a day, doing medium work" (id.). Plaintiff's assertions fall short.

The ALJ found "partially persuasive" the opinions of the state agency medical consultants limiting Plaintiff "to work at the medium exertional level with additional postural, manipulative, and environmental limitations" (Tr. 32; see also Tr. 77-79, 90-92, 105-07), but "f[ound] that the limiting [sic] [Plaintiff] to standing, walking, or sitting only 6 hours in an 8-hour workday [wa]s not supported in the record" (id.). The ALJ set forth the following explanation of that finding:

> While [Plaintiff]'s degenerative joint disease of the knee is documented and would reasonably cause the postural limitations found, the evidence does not support any limitation in sitting, standing, or walking, when ordinary breaks are considered. . . . [I]n his disability report dated August 5, 2019, [Plaintiff] did not even list arthritis as an impairment. He did assert that he had pain in his knees and difficulty walking in a function report dated August 13, 2019 and in a Disability Report dated January 27, 2020, which he completed with the assistance of his representative. Nonetheless, more significantly, it was not until March 8, 2021, that [Plaintiff] reported knee pain to his primary care physician for the first time since 2017, and then he declined any treatment.
>
> The [ALJ] further notes that in November 2019, imaging of [Plaintiff]'s left knee showed only moderate osteoarthritic change centered on the medial compartment with milder changes laterally and of the patellofemoral compartments. Moreover, . . . while neither the [DOT]

nor the regulations include any limitation in sitting,
standing, or walking in the definition of "medium"
exertion, the state agency as a matter of course always
includes such a limitation. The [ALJ] generally
otherwise finds the consultants' limitation to medium
exertional level work with additional postural and
manipulative limitations consistent with the evidence of
record. [Plaintiff] was diagnosed and treated for
diabetes. However, [Plaintiff]'s treatment history
during the relevant period has been conservative with no
evidence of surgical intervention or end-stage organ
damage. In particular, during multiple examinations,
[Plaintiff] had a normal motor exam and no edema. The
[ALJ] notes that[,] in an August 17, 2019 Adult Function
Report, [Plaintiff] reported being able to complete
simple meals, do laundry, mow grass, drive, and shop.
The [ALJ] further notes that in the [RFC] the fingering
limitation accounts for [Plaintiff]'s finger contracture
and the limitation to avoid hazards accounts for any
potential low glucose times.

(Tr. 33 (internal parenthetical citations omitted).) Plaintiff
attacks that analysis on five grounds, none of which establish a
basis for remand.

Plaintiff first describes the ALJ's decision not to adopt the
state agency physicians' limitation to six hours of standing and
walking as "a classic case of a judge substituting her opinion for
that of physicians." (Docket Entry 15 at 7.) Although Plaintiff's
counsel "cannot speak to what the [s]tate [a]gency does 'as a
matter of course'" (id. (quoting Tr. 33)), Plaintiff contends that
"the limitation to standing or walking six hours per day appears to
be more than justified by the moderate osteoarthritic changes in
the medial compartment [of Plaintiff's left knee] with milder
changes in other compartments of the knee joint." (Id. (citing Tr.

21

407-09).)  Plaintiff further faults the ALJ for inserting the word
"'only'" in front of her description of the finding in Plaintiff's
left knee x-ray of "moderate osteoarthritic changes" (id. (quoting
Tr. 33)), as well as for failing to mention the x-ray's findings of
"'breaking of the tibial spines' and '[t]iny spurs aris[ing] from
the margins of the patella'" (id. (purporting to quote Tr. 407)).

     Although Plaintiff did not further elaborate on his argument
that the ALJ "substitut[ed] her opinion for that of physicians"
(id.), he might have based such argument on the fact that the ALJ
did not fully adopt any of the medical opinion evidence in the
record (see Tr. 32-33 (finding Dr. Burgess's report "not
persuasive," and the state agency medical consultants' opinions
"partially persuasive")).  As recently well-explained by another
district court within the Fourth Circuit, such circumstances,
standing alone, do not establish improper substitution of lay
opinion by the ALJ:

> Of interest here, is that the ALJ adopted none of the
> medical experts' opinions providing for greater
> restrictions in the [p]laintiff's RFC[;] however, it is
> clear that the ALJ did "consider and address" the medical
> source opinions of record [in compliance with Social
> Security Ruling 96-8p, Titles II and XVI: Assessing
> Residual Functional Capacity in Initial Claims, 1996 WL
> 374184, at *7 (July 2, 1996) ("SSR 96-8p")].  Although
> the [p]laintiff contends that the ALJ substituted his own
> lay opinion for those provided by the medical sources,
> this argument appears to hinge mainly on the basis that
> the ALJ simply did not adopt the opined greater
> restrictions.  . . .  [T]he Fourth Circuit has long
> recognized that the RFC "is an administrative assessment
> made by the Commissioner based on all the relevant

22

evidence in the case record." <u>See</u> <u>Felton-Miller[ v.</u>
<u>Astrue</u>, 459 F. App'x 226, 230-31 (4th Cir. 2011)] . . . .

Instead, an ALJ must consider all relevant evidence in
the record, including the medical opinions, and craft an
RFC that is supported by substantial evidence. 20 C.F.R.
§ 404.1545(a)(1). In this case, the ALJ did not engage
in "playing doctor" by interpreting imaging or other
evidence when he rejected the opined RFC limitations: the
ALJ relied primarily on the limited medical record from
the relevant period and . . . considered the objective
clinical and diagnostic findings, the [p]laintiff's
statements, as well as the medical source opinions in
arriving at the RFC finding. The ALJ summarized and
analyzed the evidence, and reconciled any perceived
conflicts; the ALJ discharged his duty under the
pertinent legal standards in determining the
[p]laintiff's RFC finding. In short, the ALJ explained
why the medical source opinions were not adopted in
compliance with SSR 96-8p, and based his explanation on
the relevant evidence of record with specific citations
allowing for judicial review.

<u>William H. v. Kijakazi</u>, No. 2:23CV91, 2023 WL 5810495, at *9
(S.D.W. Va. Aug. 17, 2023) (unpublished), <u>recommendation adopted</u>,
2023 WL 5804320 (S.D.W. Va. Sept. 7, 2023) (unpublished); <u>see also</u>
<u>Gilmore v. Kijakazi</u>, No. 1:21CV420, 2022 WL 2869047, at *8
(M.D.N.C. Jul. 21, 2022) (unpublished) ("[T]he ALJ labored under no
requirement to fashion an RFC that exactly matched . . . the
opinion evidence."), <u>recommendation adopted</u>, 2022 WL 3446133
(M.D.N.C. Aug. 17, 2022) (unpublished) (Biggs, J.); <u>Jackson v.</u>
<u>Commissioner, Soc. Sec.</u>, Civ. No. 13-2086, 2014 WL 1669105, at *2
(D. Md. Apr. 24, 2014) (unpublished) ("[A]n ALJ need not parrot a
single medical opinion, or even assign 'great weight' to any
opinions, in determining an RFC assessment."), <u>recommendation</u>

23

adopted, slip op. (D. Md. May 14, 2014); compare Arakas v. Commissioner, Soc. Sec. Admin., 983 F.3d 83, 108–09 (4th Cir. 2020) (holding that, "[b]ecause the ALJ lacked the medical expertise to interpret a cervical MRI, he erred in discounting" physician's opinion that the plaintiff's "'cervical MRI showed clear evidence of chronic cervical spasm'" and "improperly substituted his own opinion" that "'an MRI would not document a chronic condition of spasm'").

Like the ALJ in William H., the ALJ here merely repeated the findings reflected in Plaintiff's left knee x-ray, and did not, like the ALJ in Arakas, interpret the findings as documenting conditions (or the severity of conditions) other than those reflected in the x-ray report. (See Tr. 33.)[7] Moreover, like the ALJ in William H., the ALJ here also pointed to substantial evidence inconsistent with the state agency medical consultants' opinions limiting Plaintiff to six hours of standing and walking –

_____

[7] Contrary to Plaintiff's argument (see Docket Entry 15 at 7 (noting that "actual report [of Plaintiff's left knee x-ray,] of course, omits the word 'only'")), the ALJ did not err by inserting the word "only" in front of the finding of "moderate osteoarthritic change" reflected in Plaintiff's left knee x-ray (Tr. 33; see also Tr. 407). The context of the ALJ's use of the word "only," i.e., explaining why she did not adopt the state agency medical consultants' limitation to six hours of standing and walking, makes clear that the ALJ meant to emphasize that the x-ray did not show more severe osteoarthritis. Nor did the ALJ err by failing to mention the x-ray's findings of "'breaking of the tibial spines' and '[t]iny spurs aris[ing] from the margins of the patella.'" (Docket Entry 15 at 7 (purporting to quote Tr. 407).) As an initial matter, the x-ray report notes "beaking of the tibial spines" (Tr. 407 (emphasis added)), and not "breaking" of those spines (Docket Entry 15 at 7 (emphasis added)). More significantly, however, the ALJ expressly recognized that the x-ray showed "milder changes laterally and of the patellofemoral compartments" (Tr. 33), which tracks verbatim the language of the x-ray report's "IMPRESSION" (Tr. 407).

24

the paucity of complaints of knee pain in the record, Plaintiff's left knee x-ray showing moderate osteoarthritic changes, Plaintiff's conservative treatment history (including lack of surgical intervention), normal motor findings on examination, and Plaintiff's daily activities – in declining to adopt those opinions. (Id.)

Second, Plaintiff faults the ALJ for observing that Plaintiff "'did not even list his [knee] arthritis as an impairment'" on his Disability Report dated August 5, 2019. (Docket Entry 15 at 8 (quoting Tr. 33).) In support of that argument, Plaintiff notes that his "list of impairments . . . in response to question 3A [on the Disability Report], which provides three spaces to list impairments . . ., was . . . completed by Hugo Almodovar, a district office employee who performed a telephone interview," who "may or may not have recognized that [Plaintiff]'s arthritis was more significant to his case than his high cholesterol." (Id. (citing Tr. 249).) Plaintiff further points out that, on his Function Report, which he completed "in [his own] handwriting," "he checked 'squatting' and 'walking'" as activities his impairments affected. (Id. (citing Tr. 268).)

To begin, Plaintiff wrongly assumes that the Disability Report form utilized by the SSA limits claimants to listing only three disabling impairments. (Id. (citing Tr. 249).) In fact, SSA Form 3368 contains five spaces to list disabling conditions, and advises

25

that, if a claimant "need[s] more space," to use "Section 11-Remarks on the last page" of the Report. See https://www.ssa.gov/forms/ssa-3368.pdf (last visited Nov. 3, 2023). Regarding the identity of the individual who prepared the Disability Report, Plaintiff cites no support for his assertion that "Hugo Almodovar, a district office employee who performed a telephone interview" (Docket Entry 15 at 8) completed the report. Notably, the Report itself identifies Plaintiff as the individual who completed the Report. (See Tr. 249 (asking, "Who is completing this report?" and reflecting answer, "The disabled person listed in [Section] 1.A." (bold font omitted)), 248 (listing Plaintiff Mark A.B. in Section 1.A.).) Furthermore, the ALJ did not solely focus on the absence of a knee impairment on Plaintiff's August 2019 Disability Report; rather, the ALJ expressly acknowledged that Plaintiff "assert[ed] that he had pain in his knees and difficulty walking in a function report dated August 13, 2019 and in a Disability Report dated January 27, 2020, which he completed with the assistance of his representative." (Tr. 33.)

Third, with regard to the ALJ's reliance on Plaintiff's daily activities, Plaintiff argues that both Dr. Burgess and the state agency medical consultants noted "that [Plaintiff] has a riding lawnmower," as well as that "[n]one of th[o]se [activities] are remotely comparable to eight hour shifts of constant standing and walking with the requirements described in the [ALJ]'s RFC." (Id.

26

at 8.) As the Commissioner points out, however, "'the ALJ cited [the claimant's] daily activities for purposes of the [subjective symptom] determination and not as examples of the functions [the claimant] could perform for an entire day.'" (Docket Entry 16 at 16 (quoting Ladda v. Berryhill, 749 F. App'x 166, 173 n.4 (4th Cir. 2018)).) Moreover, Plaintiff's daily activities constituted just one factor the ALJ considered in evaluating Plaintiff's subjective symptom reports, as the ALJ also discussed Plaintiff's statements to his medical providers (see Tr. 31-32) and the nature and extent of Plaintiff's treatment (see Tr. 31-33).

Fourth, Plaintiff contends that, because Dr. Burgess rated Plaintiff's "'work-related activities'" as "'mildly and intermittently more moderately impaired'" (Docket Entry 15 at 9 (quoting Tr. 414)), "we can add Dr. Burgess's opinion to those of the [state agency] physicians who do not believe [Plaintiff] can stand on his feet eight hours a day, doing medium work" (id. (emphasis added)). To begin, Dr. Burgess did not offer an opinion regarding Plaintiff's ability to stand (see Tr. 414 (finding abilities to bend, stoop, lift, walk, crawl, squat, carry, travel, push, pull, speak, and hear "mildly and intermittently more moderately impaired"); see also Tr. 410 (reflecting Plaintiff's report to Dr. Burgess that Plaintiff "d[id] not have a specific length of time that he c[ould] be up on his feet")). More significantly, however, the ALJ found Dr. Burgess's opinions "not

27

persuasive" (Tr. 32) and, as discussed above in the context of
Plaintiff's first issue on review, the ALJ did not err in making
that finding.

Fifth, concerning the ALJ's notation of the lack "of surgical
intervention or end-stage organ damage" (Tr. 33), Plaintiff argues
as follows:

> End organ damage to the knees would involve soft tissues:
> ligaments, tendons, muscles, cartilage. The radiograph
> that identified the osteoarthritis was identified as
> "RAD/DG KNEE," meaning that it only pictured bone. We do
> not know if there was end organ damage or not. As far as
> [P]laintiff not having undergone surgery, there are many
> good reasons for a patient to decline that. The fact
> that [P]laintiff declined surgery does not mean he can do
> the lifting, standing, frequent stooping, kneeling,
> crouching, and crawling in the ALJ's RFC.

(Docket Entry 15 at 9 (internal parenthetical citation omitted)
(citing Tr. 407).) Plaintiff's argument that he might have "end
organ damage" in the soft tissues of his knees misses the mark,
because the ALJ noted the absence of "end-stage organ damage" in
the context of Plaintiff's diabetes mellitus, not his knee
osteoarthritis. (See Tr. 33.) Plaintiff has not pointed to any
evidence of end-stage organ damage relating to his diabetes to
contradict the ALJ's assertion. (See Docket Entry 15.)
Plaintiff's contention respecting the ALJ's reliance on the lack of
"surgical intervention" fares no better. Although Plaintiff
asserts that "good reasons" exist for declining surgery (id. at 9),
the record does not contain evidence that Plaintiff's treatment

28

providers recommended Plaintiff undergo surgery to treat diabetic complications which he then declined; rather, the ALJ accurately pointed out that the record fails to reflect _any_ surgical interventions for Plaintiff's diabetes symptoms (see Tr. 33).

In short, Plaintiff has not shown that the ALJ erred in declining to adopt the state agency medical consultants' opinions limiting Plaintiff to six hours of standing and walking in a workday and, as a result, his second assignment of error fails to warrant remand.

### 3. **Ability to Perform Medium Work**

Lastly, Plaintiff argues that he "would have been unable to do the full range of medium work required in jobs on which the ALJ relied due to documented limitations." (Docket Entry 15 at 9 (block formatting and underscoring omitted).) More specifically, Plaintiff maintains that the "deformity in the little finger of his right, non-dominant hand . . . would interfere with jobs requiring grasping and holding with both hands." (_Id._ at 10.) Plaintiff additionally faults the ALJ for failing to order a "right hand x-ray," noting that "[t]he ALJ ha[d] an affirmative duty to assist [Plaintiff] in developing [his] case[], especially [because he was] represented by [a] non-attorney[]." (_Id._)

Regarding Plaintiff's right finger deformity, Plaintiff contends that he "told Dr. Burgess that the arthritic pain in

29

[Plaintiff's] hands was worse than the pain in his knees" (id. (citing Tr. 410)) and, because "[t]he basis for [Plaintiff's] knee pain is well documented, [] there is reason to believe that there is arthritis, as bad or worse, in his hands" (id.). Although Plaintiff concedes that his "general arthritic hand pain" lacks "document[ation] by radiograph" (id.), as well as that Dr. Burgess "reported that [P]laintiff was able to write and pick up coins with either hand without difficulty" (id. (referencing Tr. 412)), and that Plaintiff had "minimal trouble with buttoning, zipping, tying, writing for long period, and the like" (id. (referencing Tr. 410)), Plaintiff asserts that "a huge difference [exists] between the ability to briefly handle small objects such as pencils or pens and coins and the handling of objects weighing up to 50 pounds and frequently objects weighing 25 pounds, as required by the ALJ's RFC" (id.).

The ALJ acknowledged Plaintiff's testimony he stopped working "mostly [because] his diabetes had him worried" (Tr. 30 (emphasis added) (referencing Tr. 54)), "that he was starting to get arthritis in his . . . hands" (id. (referencing Tr. 57)), as well as Plaintiff's concession that he "was not getting treatment for his . . . hands" (see id. (emphasis added) (referencing Tr. 58); see also Tr. 62 (documenting Plaintiff's testimony that he did not take any medication for his hand pain)). Consistent with that concession, the record lacks any complaints to (or treatment by)

30

Plaintiff's medical providers of hand arthritis or pain. (See Tr. 341-469.) Moreover, as noted above, the ALJ acknowledged Dr. Burgess's observation that Plaintiff could "write and pick up coins with either hand without difficulty" (Tr. 31 (emphasis added) (referencing Tr. 412)), as well as that Plaintiff "had a 90-degree contracture of the right fifth digit," but that, "[o]therwise, the range of motion of the joints of both hands was normal" (id. (emphasis added) (referencing Tr. 412)). In accord with those findings, the ALJ found Plaintiff's right finger contracture a severe impairment at step two of the SEP (see Tr. 28), and included a limitation to frequent fingering with the right upper extremity in the RFC (see Tr. 30) expressly to "account[] for [Plaintiff]'s finger contracture" (Tr. 33).[8] Plaintiff simply has not shown that the record evidence should have compelled the ALJ to adopt greater limitations in the RFC to account for Plaintiff's hand impairments.

Plaintiff's complaint that the ALJ failed to fulfill his duty to develop the record by neglecting to order a "right hand x-ray" also falls short. (Docket Entry 15 at 10.) Although "the ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record," Cook v. Heckler, 783 F.2d 1168, 1173-74 (4th Cir. 1986) (citations omitted), the ALJ discharges his duty to develop the record when "the record is

_____

[8] The ALJ also limited Plaintiff to frequent pushing and pulling with the right upper extremity. (See Tr. 30.)

31

adequate to make a determination regarding the claimant's disability claim," France v. Apfel, 87 F. Supp. 2d 484, 490 (D. Md. 2000). In order to demonstrate that the ALJ failed to develop the record, a claimant must show that "evidentiary gaps" existed that prejudiced his or her rights, Blankenship v. Astrue, No. 3:11CV5, 2012 WL 259952, at *13 (S.D.W. Va. Jan. 27. 2012) (unpublished) (citing Marsh v. Harris, 632 F.2d 296, 300 (4th Cir. 1980)), and that he or she "'could and would have adduced evidence that might have altered the result,'" id. (quoting Carey v. Apfel, 230 F.3d 131, 142 (5th Cir. 2000)).

In this case, given that 1) Plaintiff did not include hand arthritis as a disabling impairment on a Disability Report (see Tr. 249), 2) did not check "[l]ifting" or "[u]sing [h]ands" as activities his conditions affected on a Function Report (Tr. 268), 3) did not seek any treatment (see Tr. 58) or take any medication (see Tr. 62) for his hand arthritis and pain, and 4) displayed full hand range of motion (excepting his right, non-dominant fifth digit for which the ALJ accounted in the RFC (see Tr. 30)), as well as the ability to write and pick up coins without difficulty on consultative examination (see Tr. 412), Plaintiff's speculation that "there is reason to believe" that a right hand x-ray would show "arthritis, as bad or worse[ as in his knees,] in his hands" (Docket Entry 15 at 10) neither demonstrates an "evidentiary gap," nor supports a conclusion that the right hand x-ray "might have

altered the result" of his case, <u>Blankenship</u>, 2012 WL 259952, at *13.

Put simply, Plaintiff's third issue on review lacks merit.

### III. CONCLUSION

Plaintiff has not established an error warranting remand.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be affirmed, and that this matter be dismissed with prejudice.

/s/ L. Patrick Auld

**L. Patrick Auld**
**United States Magistrate Judge**

December 15, 2023